UNITED STATES of America,
Plaintiff–Appellee,

v.

Leonard PETITJEAN, Jr.,
Defendant–Appellant.

No. 88–1886.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 9, 1989.

Decided Sept. 5, 1989.

Steven Shobat, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Office of the U.S. Atty., David J. Stetler, Howard M. Pearl, James R. Ferguson, and Zaldwaynaka L. Scott, Asst. U.S. Attys., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for U.S.

George P. Lynch, Weiss & Associates, Chicago, Ill., for defendant-appellant.

Before CUMMINGS and KANNE, Circuit Judges, and GRANT, Senior District Judge.*

KANNE, Circuit Judge.

Defendant-appellant, Leonard Petitjean, Jr., appeals his conviction of extortion and two federal offenses relating to firearms. He argues that one count of his indictment was duplicitous, that the counts in the indictment of which he was convicted were not supported by sufficient evidence, that the district court improperly limited cross-examination of government witnesses and improperly excluded a tape-recording presented by the defense under the confrontation clause, and that the district judge denied Petitjean his right to due process by sentencing him based on "ex parte communications from unknown sources."

* The Honorable Robert A. Grant, United States Senior District Judge for the Northern District of Indiana, is sitting by designation.

For the reasons discussed below, we affirm.

## I. Facts

Peter R. Ryan owned and operated a landscaping business. He had known the defendant, Leonard Petitjean, Jr., for approximately 20 years. They had done business with one another for seven or eight years. In May of 1987, Petitjean offered to sell Ryan a mobile telephone for $1,500.00. Although Ryan was interested in purchasing the phone, he did not have the money to purchase it at that time. On July 28, 1987, Petitjean came to Ryan's office in Warrenville, Illinois. He told Ryan that he already had written a check for the money and had to borrow money from the "mob" to cover it. Petitjean also told Ryan that he had to pay $75.00 a week in interest on the money he borrowed. Ryan indicated that he would help pay this interest. During this meeting, Petitjean put Ryan in a headlock and punched him several times. He also threatened Ryan with a pistol, saying he ought to kill him and blow his knee caps off. On August 10, 1987, Ryan gave Petitjean a check for $75.00.

On August 24, 1987, Petitjean appeared at Ryan's place of business, saying he wanted "collateral" for the money Ryan supposedly owed him. Although Ryan was not there, Petitjean took some of Ryan's lawn care equipment and a trailer. Ryan went to Petitjean's house to retrieve the trailer on August 25, 1987. At that time, Petitjean forced Ryan into a truck at gunpoint, took him for a ride, punched him in the jaw and screamed at him, and told him that he now owed Petitjean $4,000.00 because of the aggravation that he (Ryan) had caused him.[1]

On August 26, 1987, Ryan complained to the police and the FBI. His subsequent telephone and in-person conversations with Petitjean were tape-recorded, and these tapes were played to the jury. Petitjean was arrested during the second of two in-person meetings.

Petitjean was charged in a six-count indictment with three counts of extortion and with three offenses relating to firearms. He was convicted of three of these counts. The first of these counts, Count II, involved extortion. The second of these counts, Count IV, involved knowingly making a false statement in connection with the acquisition of a firearm. The third of these counts, Count V, involved knowing possession of a firearm by a person previously convicted of a felony.

At the time of his arrest, the FBI agents recovered a loaded .25 caliber Beretta from Petitjean's right pants pocket. At trial, Michael Casserly, an employee of the Gun Lodge, a retail store that sold firearms, testified for the government. He indicated that it was unclear to him who had filled out the required ATF (Alcohol, Tobacco and Firearms) Form 4473 that was completed when Petitjean purchased the gun. This form, which reflected that Petitjean was the purchaser of the gun, had a box marked "no" in response to a question inquiring whether the applicant ever had been convicted of a crime punishable by imprisonment for a term exceeding one year. The government also introduced two prior convictions of Petitjean for theft of property. Moreover, the parties stipulated that the gun purchased by Petitjean was manufactured in Maryland and shipped to Indiana before Petitjean purchased it.

At trial, the district court precluded the defense from cross-examining Peter Ryan as to debts ostensibly owed by him to Petitjean. It also precluded the defense from cross-examining police officer John Ripsky as to prior inconsistent statements he had made about Ryan's credibility. The district court also refused to allow the defendants to introduce into evidence a 911 emergency call recording. The call which was the subject of that recording was made by Mrs. Petitjean at the time of Mr. Petitjean's arrest.

The sentencing judge, as is customary in the Northern District of Illinois, sent Petitjean's presentence investigation report to the Sentencing Council, which is composed of judges on the court. Because Judge

---

1. The amount Ryan "owed" to Petitjean later was upwardly revised to $5,000.00.

Shadur was absent from the Council on the day Petitjean's case was considered, recommendations were sent to him in writing. At Petitjean's sentencing, the judge disclosed that one note sent to him stated "this guy is scary."

Petitjean appeals his conviction on numerous grounds. First, he argues that one count of the indictment was duplicitous. He also challenges his conviction on evidentiary and sufficiency of the evidence grounds, as well as bringing a challenge to the Sentencing Council procedure. We will discuss these arguments in turn.

## II. Discussion

### A. *Duplicitous Count in the Indictment*

■ Petitjean first argues that Count II of the indictment was duplicitous because it charged both the inchoate offense of attempt to extort and the substantive offense of extortion. Even assuming that the indictment is duplicitous, however, Petitjean has waived this argument. Under Federal Rule of Criminal Procedure 12(b)(2), defenses and objections based on defects in the indictment or the information must be raised prior to trial. Otherwise, they are waived under Rule 12(f) of the Federal Rules of Criminal Procedure. *United States v. Goudy*, 792 F.2d 664, 670 (7th Cir.1986). In Petitjean's pre-trial "Motion to Dismiss Indictment" he raised various challenges to the indictment, including multiplicity, but did not raise duplicity as a basis for dismissal.[2] Although a court may grant relief from a waiver for good cause shown, Petitjean did not make any attempt to show good cause. Thus, we agree with the government that this argument is waived.

### B. *Sufficiency of the Evidence*

#### 1. *Extortion (Count II)*

Petitjean was convicted with one count of violating the Hobbs Act, 18 U.S.C. § 1951. This statute provides in part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

.    .    .    .    .

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear, or under color of official right.

Count II of the indictment charged Petitjean with extorting the payment of $1,500.00 from Peter Ryan on August 27, 1987. Petitjean essentially argues that he did not violate the Hobbs Act because no "wrongful use of actual or threatened force, violence, or fear" occurred. In other words, Petitjean maintains that no extortion occurred. We disagree. Not only did Petitjean make several threats to Ryan during this conversation, but the defendant also made threats to Ryan on prior occasions which would have induced him to pay the money to Petitjean on that day.

■ First, we note that we must affirm the verdict if the evidence, when viewed in a light most favorable to the government, establishes that any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see also United States v. Field*, 875 F.2d 130, 137 (7th Cir.1989); *United States v. Muskovsky*, 863 F.2d 1319, 1322 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1345, 103

---

**2.** Petitjean's objection was as follows:
  2. The indictment was multiplicitous in that it joins separate and distinct offenses in separate counts of the indictment; said offenses are not related one to the other in time, in object or in intent.

We agree with the government that this does not suffice to preserve the objection Petitjean now makes on appeal because it refers to 'separate counts' rather than Count II.

L.Ed.2d 813 (1989); *United States v. Spivey*, 859 F.2d 461, 463 (7th Cir.1988); *United States v. Leibowitz*, 857 F.2d 373, 380 (7th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989). In this case, there is sufficient evidence to meet this standard.

■ On July 28, 1987, in connection with his demand for interest, Petitjean punched Ryan, placed him in a headlock, showed him a gun, threatened to kill him, and threatened to blow his knee caps off. On August 24, 1987, Petitjean went to Ryan's business and removed his property, refusing to return it until Ryan paid him money. On August 25, 1987, two days before the meeting on August 27, Petitjean forced Ryan into a truck at gunpoint and took him for a ride during which time he punched him in the jaw and screamed at him, and told him that he now owed Petitjean $4,000.00 (later revised upward to $5,000.00). Petitjean also frequently mentioned the "mob" and the "syndicate." He created the impression that the "mob" was pressuring him for money and that they would order Petitjean to "take care" of Ryan if he did not pay Petitjean the money. These threats all evidently induced fear in Ryan, who contacted the police and the FBI. *Cf. United States v. Duhon*, 565 F.2d 345, 351 (5th Cir.), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978) (where testimony at trial regarding victim's state of mind during the period before he offered money to the defendant showed that he was motivated by anticipation of economic loss, this constituted "fear" within the meaning of the Hobbs Act).

Petitjean argues that the only threat he made to Ryan on the afternoon in question was that he would go into the house if Ryan did not pay him $1,500.00. This clearly is not so. Petitjean in fact made numerous threats at the August 27, 1987 meeting. First, when Ryan requested the return of his equipment, Petitjean replied that Ryan would get it only when Ryan paid him money. Petitjean, moreover, insisted on a $5,000.00 payment instead of the $1,500.00 Ryan ostensibly owed him for

the portable telephone (which, incidentally, Ryan never received). Petitjean also told Ryan that the "mob" had doubled the amount because of his delay. He also warned Ryan that if he had a bug on him, he should "see this" and then gestured with his hand in his pocket to suggest he had a gun. When Ryan asked if Petitjean had a gun, Petitjean answered "I'm never without. I never go without." Toward the end of the conversation, according to Ryan, Petitjean whispered the following threat in Ryan's ear: "Come here I wanna tell you something. Anything happens to any of my equipment, or anything here. I'll kill ya. And you think I'm kiddin' you, just try me." These threats, which occurred on the day of the extortion, clearly were sufficient to induce fear in Ryan. *United States v. O'Malley*, 796 F.2d 891, 902 (7th Cir.1986) (where defendant said to victim "you don't talk to me on the phone the way you did. I want you to know I am the enforcer around here," the victim's office at his place of business burned down one month later and a co-conspirator subsequently stated that he "expected it," and the victim paid over $25,000.00 over a period of four years in order to "stay in business and to stay alive," the requisite fear was established at trial).

### 2. *Knowing False Statement in Connection with a Firearm (Count IV)*

■ Petitjean was charged with making a knowing false statement to a licensed firearms dealer in connection with the purchase of a firearm in violation of 18 U.S.C. § 922(a)(6). To sustain a conviction of violating § 922(a)(6), the government must prove that the defendant knowingly made a false statement to a licensed firearms dealer, that the false statement was made in acquisition of a firearm, and that the false statement was likely to deceive the firearm's dealer as to the lawfulness of the sale of a firearm. *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir.1983); *United States v. Thomas*, 484 F.2d 909, 911–12 (3d Cir.), *cert. denied,* 414 U.S. 912, 94 S.Ct. 253, 38 L.Ed.2d 151 (1973); *United States v. Beebe*, 467 F.2d 222, 226 (10th Cir.1972), *cert. denied,* 416 U.S. 904, 94

S.Ct. 1607, 40 L.Ed.2d 108 (1974). Petitjean disputes that he knowingly made a false statement to the firearms dealer. We disagree with this contention.

■ First, we note that specific intent is not an essential element of a § 922(a)(6) offense. The government only has to prove that the defendant knowingly made a false statement. *Harrelson*, 705 F.2d at 736; *Beebe*, 467 F.2d at 226. There clearly was sufficient evidence in this case to support Petitjean's knowledge of making a false statement.

■ Petitjean maintains that because he was illiterate, this was a defense to knowledge. In support of his argument, Petitjean relies on the testimony of Michael Casserly, the Gun Lodge employee who sold him the gun (1) that he could not identify Petitjean as the purchaser of the gun in 1984; (2) that he could not remember exactly whether the procedure to which he testified regarding persons who could not read (discussed below) was followed in regard to the specific purchase; (3) he had no current recollection of the form being filled out; and (4) that the other information filled out on the form was filled out incorrectly. Petitjean also relies on testimony of defense witnesses, including Mrs. Petitjean, that he never read books or newspapers, and that she helped him with all of his business transactions. He also contends that "no" written on the form was not in his handwriting.

It is unclear whether illiteracy is a defense in a case such as this. *Compare United States v. Heath*, 536 F.2d 1069, 1070 (5th Cir.1976) ("[a] person signing a document sufficiently adopts the writing as his own, so that if it is false, he can be held for making the false statement.") *with United States v. Squires*, 440 F.2d 859, 864 (2d Cir.1971) (where defendant claimed that he had signed the form without reading, in order to convict him of violation of § 922(a)(6), jury had to find either (1) that the defendant had read the form and was "aware of a high probability" that he was prohibited by the cited statutes from receiving a firearm in interstate commerce or (2) that he deliberately avoided reading the

form and that, if he had read it, he would have been "aware of a high probability" that he was prohibited by the cited statutes from receiving a firearm in interstate commerce). We need not decide this issue, however, because even if it is before us, we believe there was sufficient evidence to support Petitjean's conviction on Count IV. First, the sales purchase receipt which was introduced into evidence bears Petitjean's name, address and date of birth. It also shows that the gun was picked up three days later. The ATF Form 4473, which also was admitted into evidence, bears Petitjean's signature. Finally, the Gun Lodge's record on the acquisitions page of its federal firearms book showed that Petitjean purchased the .25 caliber Beretta.

Michael Casserly, the Gun Lodge employee who sold the gun to Petitjean, testified that during the two years he was employed at the Gun Lodge only three to five persons purchased guns who stated they could not read. When a person could not read and had assistance from someone accompanying him, that person would fill out the form, and Casserly would make a notation that the purchaser could not read at the bottom of the form. The ATF Form 4473 completed in this transaction had no such notation.

On cross-examination, moreover, Mrs. Petitjean admitted that she did not accompany her husband when he purchased the gun or picked it up from the Gun Lodge. She also testified that she did not complete the ATF Form 4473 for him. Mrs. Petitjean also conceded that Mr. Petitjean confronted situations where he was required to read without her assistance. Moreover, a defense witness, the principal of the high school the Petitjean's children attend, testified that Petitjean asked to see a program at a wrestling match, which program contained reading material.

Even if illiteracy is a defense, then, there was a dispute at trial over Petitjean's illiteracy. This case is similar to *Heath*, where the defendant's signature on the form appeared as an "X" mark. The sales clerk in that case could not identify the defendant, but testified that he read the questions out

loud and recorded his answers, while the defendant denied being asked the questions on the form. In affirming the jury's conviction, the court concluded that in "finding defendant guilty, the jury must have credited the sales clerk's testimony that he asked defendant the required questions and that the defendant responded falsely," 536 F.2d at 1070. In this case, there was conflicting testimony as to whether Petitjean was sufficiently literate to have read the ATF Form 4473. As in *Heath,* in finding Petitjean guilty, the jury evidently rejected Petitjean's illiteracy defense. As this court previously has noted, it is not our function to reconsider the evidence or to assess the credibility of the witnesses. *United States v. D'Antoni,* 874 F.2d 1214, 1220–21 (7th Cir.1989) (quoting *United States v. Whaley,* 830 F.2d 1469, 1472–73 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988)). Thus, we find that Petitjean's conviction for a false statement in connection with the purchase of a firearm was supported by sufficient evidence.

### 3. *Possession of a Firearm after Previous Felony Conviction (Count V)*

■■ Count V charged Petitjean with violating 18 U.S.C. § 922(g)(1). In order to convict someone under this statute, the government must prove: (1) that the defendant had a previous felony conviction, (2) that the defendant possessed a firearm, and (3) that the firearm had travelled in or affected interstate commerce. *United States v. Jordan,* 870 F.2d 1310, 1314 (7th Cir.1989) (discussing predecessor statute). The uncontradicted evidence in this case demonstrated that when Petitjean was arrested on September 2, 1987 at his home, a loaded .25 caliber Beretta handgun was found in his right pants pocket. The government also had admitted into evidence a certified copy of Petitjean's two felony convictions for theft of property.

Petitjean, moreover, is incorrect that the facts of this case do not satisfy the minimum required nexus with interstate commerce. He stipulated at trial that the .25 caliber Beretta found in his pants pocket was manufactured in Maryland and shipped to Indiana prior to coming to rest in Illinois. This clearly satisfied the interstate commerce requirement. *United States v. Lowe,* 860 F.2d 1370, 1374 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989) ("It is firmly established that under § 922(g), proof of a gun's manufacture outside of the state in which it was allegedly possessed is sufficient to support the factual finding that the firearm was 'in or affecting commerce.' ").

Petitjean also claims that the gun was placed in his pocket by his wife over his objections while in his own home. He argues that Illinois law allows a person to possess and carry a weapon while on his fixed place of business or in and about his home, and cites *United States v. Gironda,* 758 F.2d 1201 (7th Cir.), *cert. denied,* 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985), for the proposition that the lawfulness of the possession of the weapon in question is a defense. *Gironda,* however, is distinguishable from this case. That case involved a violation of an earlier version of 18 U.S.C. § 924(c)(2), which prohibited carrying a firearm unlawfully during the commission of a felony. To commit that offense, a defendant's carrying of the firearm had to have been unlawful. We held there that a jury may rely on state law to determine whether the carrying of the firearm was lawful. *Id.* at 1213–14. Whether or not the weapon is unlawfully being carried under state law, however, has nothing to do with whether § 922(g) is violated. Thus, Petitjean properly was convicted of this offense as well.

### C. *Confrontation Clause*

Petitjean challenges three evidentiary rulings of the district court as violating his rights under the confrontation clause of the sixth amendment. We address these three rulings in turn.

### 1. *Cross-examination of Ryan as to Debts*

First, Petitjean contends that he should have been allowed to cross-examine Peter

Ryan as to the money he owed to him (Petitjean). As the government points out, Petitjean evidently was hoping, in cross-examining Ryan as to the existence of these debts, to show that Ryan was untruthful in denying that he had any debts.

■ The existence of any debts owed by Ryan to Petitjean is not relevant in and of itself. Section 1951 of Title 18 of the United States Code proscribes use of force, except in certain limited circumstances not relevant here, in obtaining property even where the defendant asserts a lawful claim of right to the property. *United States v. Agnes,* 753 F.2d 293, 297–99 (3d Cir.1985); *United States v. Zappola,* 677 F.2d 264, 268–70 (2d Cir.), *cert. denied,* 459 U.S. 866, 103 S.Ct. 145, 74 L.Ed.2d 122 (1982).

■ To the extent, moreover, that the nature and existence of Ryan's debts to Petitjean affected Ryan's credibility, even if it was error for the district court to forbid cross-examination as to Ryan's debts for this purpose, this error was harmless. In *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986), the Supreme Court set forth the factors to consider in assessing harm caused by limitations on cross-examination. These are: the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of corroborating or contradictory evidence, the extent of cross-examination permitted, and the overall strength of the government's case. In this case, the cross-examination of Ryan was extensive, lasting an entire afternoon. The issue of Ryan's credibility was brought out through other witnesses. At trial, five witnesses stated that Ryan's reputation for truthfulness was bad. Two of these witnesses, moreover, were government witnesses. Moreover, evidence of Ryan's and Petitjean's business relationship was elicited at trial, through the testimony of Mrs. Petitjean. Thus, any error in refusing to allow the cross-examination was harmless. *United States v. Robinson,* 832 F.2d 366, 373 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1739, 100 L.Ed.2d 203 (1988) (the jury must have been given "sufficient information to make a discriminatory appraisal of the witness' motive and bias").

### 2. *Cross–Examination of Officer John Ripsky*

■ At trial, John Ripsky, a Naperville police officer, testified that Ryan complained to him about Petitjean's threats. On cross-examination, while inquiring into Ryan's reputation for truthfulness, defense counsel attempted to impeach Ripsky with a prior inconsistent statement made to an FBI agent. This statement was that Ripsky had said that he believed Ryan was on the fringe of the law and that he believed Ryan had been involved in various illegal activities. Ripsky also purportedly had stated that Ryan had associated in high school with persons involved in illegal activity. Petitjean claims that the district court erred in curtailing the cross-examination of Ripsky on the subject of these prior derogatory comments he had made to others about Ryan.

We believe that the district court correctly sustained the government's objection to this testimony. Rule 611(b) of the Federal Rules of Evidence provides that cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. Under Rule 608(a) of the Federal Rules of Evidence, the credibility of a witness may be attacked in the form of opinion or reputation evidence in regard to the witness' character for truthfulness or untruthfulness, and Rule 608(b) of the Federal Rules of Evidence forbids the use of extrinsic evidence to prove specific instances of conduct of a witness to attack his credibility unless, in the discretion of the court, they concern the witness' character for truthfulness. Here it has not been shown that the district court abused its discretion in ruling that Petitjean could not use specific acts of misconduct to challenge Ripsky's opinion regarding Ryan's credibility in general. *See, e.g., United States v. Perez,* 870 F.2d 1222, 1225 (7th Cir.1989) (district court did not abuse its discretion in excluding testimony about witness' prior drug arrest and

conviction for impeachment purposes under Rule 608(b)).

### 3. *Exclusion of the 911 Emergency Call Recording*

■ Finally, Petitjean objects on appeal to the district court's exclusion of a 911 emergency call recording, wherein Mrs. Petitjean called the police, claiming that she believed her husband was in danger, and claiming that she thought that someone had been shot and requesting an ambulance. Petitjean claims that this evidence was relevant to corroborate Mrs. Petitjean's claim that she put the gun in her husband's pocket. We agree with the government and the district court, however, that this call was not relevant to any of the offenses charged. Moreover, because the factual predicate underlying the conversation never existed (because no one was in fact shot), admission of this tape was highly prejudicial, and thus properly was excluded under Rule 403 of the Federal Rules of Evidence.

### D. *Sentencing*

Petitjean's last argument is that his right to due process of law was violated when he was sentenced based on what he calls *"ex parte* communications from unknown sources." He claims this in part because one of the members of the Sentencing Council sent Judge Shadur a note reading "this guy is scary." Petitjean claims that he never saw the note, was not prepared to address his attention to the note and does not know what facts the judge who wrote the note relied upon in making this statement. He also claims that he did not know that third parties would be looking at his presentence investigation report. Petitjean also maintains that this investigation contained erroneous facts (although he does not say what these facts are) which, he claims, "the unknown judge [who wrote the note] obviously considered."

It is difficult to tell exactly to what Petitjean is objecting here. He seems to be objecting, first of all, to any use of a sentencing council. We note that other circuits have approved of sentencing councils composed entirely of judges. *United States v. Gonzales*, 765 F.2d 1393 (9th Cir. 1985), *cert. denied*, 474 U.S. 1068, 106 S.Ct. 826, 88 L.Ed.2d 798 (1986); *United States v. Driscoll*, 496 F.2d 252 (2d Cir.1974). Although this circuit has disapproved of sentencing councils which include probation officers, *United States v. Spudic*, 795 F.2d 1334 (7th Cir.1986), use of a sentencing council composed only of judges was not an issue in that case. *Id.* at 1343 n. 9. Because Petitjean raises this issue in such a cursory manner, however, we believe that it is waived. *See Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir.1987).

■ Second, Petitjean seems to argue that the district judge improperly relied upon the note. Petitjean did not, however, object any time during the sentencing to this note. Even if it did add any factual information, failure to object to factual inaccuracies in the presentence report waives them. Fed.R.Crim.P. 32(c)(3); *United States v. Plisek*, 657 F.2d 920 (7th Cir. 1981). Even assuming that this objection was not waived, the assertion of the one judge that "this guy is scary" was pure opinion. It did not constitute any factual evidence upon which the district court could have relied in sentencing. Even if it were not merely opinion, the district judge did not seem to rely upon it. Rather, he commented, in the context of saying that although he believed that the defendant really was going to change his ways, a probationary term was not warranted in this case:

> One of my colleagues on Sentencing Council sent along a little personal note along with the recommendation saying, "This guy is scary." That's something I [hope] is not going to be true anymore. But on balance, I cannot in good conscience respond to these offenses with the suggestion of your counsel, although it's certainly earnestly presented, and [your attorney] is extraordinarily competent counsel in presenting it, and you yourself have said these things, but I cannot find that these offenses properly call for a probationary term.

In fact, the sentencing judge did not seem to rely here on the Sentencing Council's recommendation in this case. Rather, the Sentencing Council's report "reenforce[d] the independent judgment that [he] had reached even before learning of those other judges' reactions." The sentencing judge relied on the evidence he heard at trial, the nature of the offenses, statements in aggravation and mitigation and on two prior incidents wherein the defendant made threats against persons who did business with him. Finally, while the Council recommended at least five years' imprisonment across the board, the sentencing judge imposed a three-year sentence with five years' probation. Thus, even if the note constituted a piece of factual information, and this objection was not waived, the district judge did not in fact rely on it.

### III. Conclusion

For the reasons discussed above, we AFFIRM the judgment of the district court.