UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

VINCENTE RAFAEL PIERRE, a/k/a
Rafael Upshur,
          *Defendant-Appellant.*

No. 02-4295

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

TRACI ELAINE UPSHUR,
          *Defendant-Appellant.*

No. 02-4333

Appeals from the United States District Court
for the Western District of Virginia, at Lynchburg.
Norman K. Moon, District Judge.
(CR-01-81)

Argued: June 3, 2003

Decided: July 25, 2003

Before WILKINS, Chief Judge, and WILLIAMS and
GREGORY, Circuit Judges.

Affirmed in part, vacated in part, and remanded by unpublished per
curiam opinion.

**COUNSEL**

**ARGUED:** Thomas Erwin Wray, Roanoke, Virginia, for Appellant Pierre; Gary Lance Smith, GARY LANCE SMITH, P.C., Winchester, Virginia, for Appellant Upshur. Thomas Jack Bondurant, Jr., Chief, Criminal Division, Roanoke, Virginia, for Appellee. **ON BRIEF:** John L. Brownlee, United States Attorney, Ly T. Nguyen, Third Year Law Intern, Roanoke, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

A federal grand jury indicted Vincente Pierre ("Pierre") and his wife, Traci Upshur ("Upshur"), on several counts related to the purchase of two firearms. Shortly thereafter, a jury convicted Pierre of: (1) conspiring to provide false statements to a licensed firearm dealer ("Count I"); (2) making false statements to a licensed firearm dealer when acquiring a firearm ("Counts II & V"); and (3) possessing a firearm as a convicted felon ("Counts III & VI"). The same jury also convicted Pierre's wife, Upshur, on Counts I, II, and V, and of disposing of a firearm to a convicted felon ("Count IV"). Pierre and Upshur now challenge the sufficiency of the evidence supporting their convictions. After reviewing the record evidence, we affirm Upshur's convictions. There is, however, insufficient evidence to sustain Pierre's conviction on Count VI. We therefore affirm his convictions in part, vacate in part, and remand for further proceedings consistent with this opinion.

I.

In July 1998, Pierre entered The Outpost Gun Shop ("The Outpost"), a firearms store owned by John Masserini, a licensed firearms dealer, to request information about purchasing an H & K USP 9 mil-

limeter firearm (the "H & K") for his wife. Because Masserini did not have the H & K in stock, Pierre provided Masserini with a deposit of $250 towards the purchase of the gun and requested that the deposit receipt be in Upshur's name.

A few weeks later, Pierre went to The Outpost and paid Masserini an additional $50 towards satisfaction of the outstanding balance on the H & K's purchase price. On August 21, 1998, Pierre returned to The Outpost. During this visit, he indicated that he would prefer to purchase a Llama .45 (the "Llama") rather than the H & K. In spite of Masserini's warning that the Llama was a "big gun" for a woman, Pierre insisted on purchasing it.

A week later, Masserini received the Llama and notified Pierre and Upshur of its arrival. Masserini, who had been in contact a few weeks earlier with agents from the Department of Alcohol, Tobacco and Firearms ("ATF") regarding Pierre's interest in purchasing the gun, notified Agent Thomas Gallagher that Pierre would be returning to the store one day later to pick up the Llama. The next day, Agent Gallagher staked out The Outpost in order to monitor the transaction.

Shortly after noon on August 28, 1998, Pierre, Upshur, and their young child entered The Outpost. Masserini retrieved the Llama and showed it to the couple. According to Masserini, Upshur completed the required paperwork to purchase the Llama, while Pierre, who was holding the child, examined the weapon by "pulling the slide back and releasing the hammer." During this time, Pierre inquired about purchasing ammunition for the Llama and paid for the same. Masserini then placed the boxed firearm and ammunition in a white shopping bag. After Upshur completed the paperwork, Pierre handed her the child, paid the remaining balance on the Llama, and picked up the white bag containing the gun. Pierre and Upshur then left The Outpost. Agent Gallagher, who was watching the front of The Outpost with binoculars from a position 100 yards away, observed Upshur carrying a child from the store. He also noticed that Pierre carried the white bag out of the store.

Approximately six months later, in March 1999, Pierre contacted Masserini to inquire about trading the Llama for a lighter firearm, the Mini-Max .45 (the "Mini-Max"). Throughout the conversation, Pierre

referred to the Llama as "his" gun. Masserini agreed to permit Pierre to trade the Llama for the Mini-Max for an additional $40. The following day, Upshur, accompanied by another man, not Pierre, went to The Outpost, filled out the required paperwork for the Mini-Max, and paid Masserini the $40 he had requested to complete the trade. Masserini then gave Upshur the Mini-Max and she left the store.

Shortly thereafter, the government filed an indictment against Pierre and Upshur in which it alleged that Pierre and Upshur had devised a scheme whereby Upshur served as "straw man" purchaser of firearms on behalf of Pierre, a convicted felon. In 2001, a federal grand jury returned a seven-count indictment against Pierre and Upshur related to the purchase of the Llama and Mini-Max. In November 2001, Judge Norman K. Moon presided over their one-day criminal trial. Among those who testified during the trial were Masserini, Agent Gallagher, Keith Bell ("Bell"), a National Rifle Association ("NRA") certified pistol instructor, and Upshur.

Masserini testified that he recalled the circumstances of the transactions at issue because he took contemporaneous notes regarding Pierre's and Upshur's gun purchases. He explained that when Upshur purchased the Llama in August 1998, he observed Pierre handling the Llama while Upshur filled out the required paperwork for the gun, but admitted that he had no knowledge of whether Pierre actually operated the Llama. Bell testified that he is a certified pistol instructor for the NRA. He explained that Upshur had enrolled in a course he taught on firearm safety and how to fire a gun. However, Bell admitted that Upshur never completed the course and that he had never observed Upshur fire a gun in his presence.

Lastly, Upshur testified in her own defense. According to Upshur, the guns she purchased from Masserini were owned by her and purchased for self-defense. She explained that because she was aware that her husband was a convicted felon and could not possess a firearm, she decided to keep the gun in a neighbor's trailer. She also disclosed that from 1991 to 1995, she had a permit to carry a firearm issued by the State of Pennsylvania. However, on cross-examination, Upshur admitted that she had never fired a live round from a firearm and that she had never disassembled a gun. According to Upshur, it was she, not Pierre, who carried the Llama out of The Outpost after

they purchased the gun in August 1998. Upshur also maintained that in March 1999, she directed Pierre to contact Masserini in order to trade the Llama for the Mini-Max. However, she later conceded that Pierre advised her regarding the purchase of the guns and that she purchased the Llama and Mini-Max with his money.

At the close of the government's case and again at the close of all evidence, Pierre and Upshur made motions for judgment of acquittal, both of which the district court denied. The jury then deliberated and returned guilty verdicts for Pierre and Upshur. Pierre was convicted on Counts I, II, III, V, and VI, and Uphshur on Counts I, II, IV, and V. Upshur, however, was acquitted on Count VII, which charged that she disposed of the Mini-Max to Pierre after she purchased the gun in 1999. In April 2002, the district court sentenced Pierre to twenty-four months of imprisonment on each count, to run concurrently, three years of supervised release on each count, and payment of a $500 special assessment. Upshur was sentenced to fifteen months on each count, to run concurrently, two years of supervised release on each count, and payment of a $400 special assessment. Pierre and Uphsur now appeal their convictions.

## II.

A jury verdict must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it. *United States v. Glasser*, 315 U.S. 60, 80 (1942). A verdict is substantially supported when a reasonable finder of fact could accept the evidence as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt. *See United States v. Newsome*, 322 F.3d 328, 333 (4th Cir. 2003). In applying this standard, this Court remains cognizant that "the jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994).

In other words, the appellate function is not to determine whether the reviewing court is convinced of guilt beyond a reasonable doubt. Rather, this Court must determine whether, viewing the evidence and reasonable inferences to be drawn therefrom in the light most favor-

able to the government, the jury could have found the elements of the crime beyond a reasonable doubt. *See id.* Given the substantial deference afforded to jury findings under this standard, "a defendant challenging the sufficiency of the evidence to support his conviction faces a heavy burden." *United States v. Beilder*, 110 F.3d 1064, 1067 (4th Cir. 1997).

## III.

### A.

We find, viewing the record evidence in the light most favorable to the government, that there is sufficient evidence to sustain Pierre's and Upshur's convictions for conspiracy to make and the making of false statements to a federally licensed firearms dealer in violation of 18 U.S.C. §§ 371 and 922(a)(6). The evidence adduced at trial demonstrated that Pierre placed the order for the guns; provided the funds for the firearms; and referred to the Llama as "his" gun when negotiating the trade for the Mini-Max. It is also undisputed that Upshur completed the paperwork necessary to purchase the Llama and Mini-Max, which identified her as the actual buyer of the firearms. From this evidence, the jury could reasonably conclude that Pierre, a convicted felon legally prohibited from possessing a firearm, conspired with Upshur to employ her as a "strawman purchaser" to obtain the guns at issue. This evidence is sufficient to sustain their convictions under 18 U.S.C. §§ 371 and 922(a)(6). *See United States v. Chorman*, 910 F.3d 102, 109 (4th Cir. 1990) (explaining that a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in a common plan); *see also United States v. Petitjean*, 883 F.2d 1341, 1345 (7th Cir. 1989) (setting forth the elements of a violation of 18 U.S.C. § 922(a)(6)). Accordingly, we affirm Pierre's and Upshur's convictions under §§ 371 and 922(a)(6).

### B.

In addition to challenging her convictions under §§ 371 and 922(a)(6), Upshur challenges the sufficiency of the evidence supporting her conviction for disposing of a firearm to a known felon in violation of 18 U.S.C. § 922(d)(1). Section 922(d)(1) provides, in relevant part:

It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person is under indictment for, or has been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year . . . .

18 U.S.C. § 922(d)(1). It is undisputed that Upshur was aware that Pierre was a convicted felon. Thus, the only issue in contention is whether, on August 28, 1998, she disposed of the Llama to Pierre.

Courts interpreting 18 U.S.C. § 922(d)(1) have held that "a disposal occurs when a person 'comes into possession, control, or power of disposal of a firearm.'" *United States v. Monteleone*, 77 F.3d 1086, 1092 (8th Cir. 1996) (quoting *Huddleston v. United States*, 415 U.S. 814, 823 (1974)). In this case, Masserini testified that Pierre examined and handled the Llama while Upshur filled out the required paperwork. He also testified, as Agent Gallagher's testimony confirmed, that Pierre carried the Llama from the store to his car, while Upshur carried their young child. Although Upshur insists that it was she, not Pierre, that carried the gun from the store in August 1998, Masserini's and Agent Gallagher's testimony contradict her assertions. This evidence was sufficient for the jury to reasonably conclude that Upshur disposed of the firearm to Pierre in violation of § 922(d)(1). *See United States v. Manbeck*, 744 F.2d 360, 392 (4th Cir. 1984) (explaining that the determination of whether a witness is credible is within the sole province of the jury).

### C.

Lastly, Pierre challenges the sufficiency of evidence supporting his conviction for possession of a firearm as a known felon in violation of 18 U.S.C. § 922(g)(1). In order to prove a violation of § 922(g)(1), the government must establish: "'(1) that the defendant was a convicted felon at the time of the offense; (2) that he voluntarily and intentionally possessed a firearm; and (3) that the firearm traveled in interstate commerce at some point.'" *United States v. Gallimore*, 247 F.3d 134, 136 (4th Cir. 2001) (quoting *United States v. Hobbs*, 136 F.3d 384, 390 (4th Cir. 1998)). The parties do not dispute that Pierre is a convicted felon or that the firearms in question traveled in inter-

state commerce at some point. The only issue before the Court is whether there is sufficient evidence in the record upon which the jury could conclude that Pierre possessed either the Llama or the Mini-Max.

As to the possession of the Llama, it was certainly reasonable for the jury to conclude that Pierre possessed the Llama within the meaning of § 922(g)(1), based on the evidence that Pierre handled and examined the gun and carried it out of The Outpost on August 28, 1998. Accordingly, we affirm Pierre's conviction on Count III.

Pierre also takes issue with his conviction on Count VI, namely, that he possessed the Mini-Max in March 1999. Courts interpreting § 922(g)(1) have emphasized that the government need not prove actual or exclusive possession to convict under this statute. *See Gallimore*, 247 F.3d at 136-37. Rather, proof of constructive possession is sufficient. *See id.* To prove constructive possession, the government must demonstrate that "the defendant exercised, or had the power to exercise, dominion and control over the item." *Gallimore*, 247 F.3d at 137 (internal quotation marks omitted).

Here, there is no evidence that Pierre had actual, exclusive, or constructive possession over the Mini-Max. In March 1999, it was Upshur, not Pierre, who went to The Outpost to pick up the firearm, and the government did not offer any evidence that Pierre exercised, or had the power to exercise control over the Mini-Max, or that he had any contact with the firearm at any time thereafter. Based on this lack of evidence, therefore, we vacate Pierre's conviction on Count VI, possession of the Mini-Max in March 1999. This conclusion is supported by the fact that the jury acquitted Upshur on Count VII, which charged that she disposed of the Mini-Max to Pierre.

### IV.

Accordingly, for the reasons stated herein, we affirm Upshur's convictions on Counts I, II, IV, and V. We also affirm Pierre's convictions on Counts I, II, III, and V, but vacate Pierre's conviction on Count VI and remand for re-sentencing.

*AFFIRMED IN PART, VACATED*
*IN PART, AND REMANDED*