Michael G. TYSON, Petitioner–Appellant,

v.

Clarence TRIGG, Superintendent of the Indiana Youth Center; and Attorney General of the State of Indiana, Respondents–Appellees.

No. 94–3359.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 20, 1995.

Decided March 20, 1995.

Rehearing and Suggestion for Rehearing In Banc Denied April 13, 1995.

Nathan Z. Dershowitz, Amy Adelson, Victoria B. Eiger, Dershowitz & Eiger, New York City, Alan M. Dershowitz (argued), Cambridge, MA, James H. Voyles, Symmes, Voyles, Zann, Paul & Hogan, Indianapolis, IN, for petitioner-appellant.

Arend J. Abel (argued), Office of the Atty. Gen., Indianapolis, IN, for Clarence Trigg.

Arend J. Abel, Matthew R. Gutwein, Office of the Atty. Gen., Indianapolis, IN, for Atty. Gen. of the State of Indiana.

Before POSNER, Chief Judge, FLAUM, Circuit Judge, and McDADE, District Judge.*

POSNER, Chief Judge.

Michael Tyson was convicted in 1992 in an Indiana state court, after a jury trial that lasted fifteen days, of the rape of W____. He was sentenced to ten years in prison, of which four were suspended. The Indiana court of appeals affirmed his conviction and sentence, *Tyson v. State*, 619 N.E.2d 276 (Ind.App.1993), and both the Supreme Court of Indiana and the U.S. Supreme Court turned down his requests for a further appeal. He then filed a petition in federal district court for a writ of habeas corpus, and he appeals to us from the denial of the petition.

█ Tyson had one appeal from his conviction. Federal habeas corpus does not entitle him to another. A federal court may intervene in the state criminal process, nullifying a defendant's conviction and sentence and forcing the state to try him anew (or else simply let him go), only if the state criminal proceeding was vitiated by an infringement of one or more of a limited subset of the defendant's federal rights. If required to substitute our judgment for that of the Indiana court of appeals, we might come to a different conclusion from that court. But we are not authorized to conceive of our job in that way. We are not to offer a further tier of appellate review. We are to determine only whether Tyson was deprived of any of his federal rights that can be enforced in a federal habeas corpus proceeding.

█ He claims to have been deprived of three such rights. The first is a right to be tried by a judge selected to preside by an impartial process. Tyson claims that the prosecutor picked the judge who tried him (more precisely, who presided at the trial, for it was a jury trial rather than a bench trial)—picked a judge who had been a sex-crimes prosecutor in the same office—and that to allow the branch of government that prosecutes to determine which judge shall preside over which criminal cases is an elementary denial of due process of law.

█ It is true that the prosecutor picked the judge in Tyson's case, Judge Gifford, and that she is a former prosecutor of sex crimes. It is also true that the right to an impartial judge is a right of whose deprivation a state prisoner may complain in a federal habeas corpus proceeding. *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927); *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363, 1379 (7th Cir.1994) (en banc); *Fero v. Kerby*, 39 F.3d 1462, 1478–80 (10th Cir.1994). And it is true, or at least we may assume it to be true for purposes of this appeal, that if Congress were to pass a law which provided that the U.S. Attorney in each district shall designate the federal district judge to preside in criminal cases, or even that the Environmental Protection Agency shall designate the federal district judge to preside in civil cases under the Clean Air Act, the law would raise profound issues under the due process clause. The question is whether it follows from all this that Tyson is entitled to a new trial.

A prosecutor in Indiana who wants to charge someone with a crime either can ask a grand jury to return an indictment or can file an information without bothering with a grand jury. (An information is much like a complaint in an ordinary civil case, only more detailed, Ind.Code § 35-34-1-2(a); *State v. King*, 502 N.E.2d 1366 (Ind.App.1987).) When Tyson's prosecution began, there were six judges in the criminal division of the Marion County (Indianapolis) superior court. Each, in addition to his or her other duties, presided over a separate grand jury and over the trial of any cases arising from the indictments returned by that grand jury. If the prosecutor's office decided to proceed by way of indictment rather than information, it chose one of the grand juries to ask to return the indictment—and by choosing the grand jury it automatically chose the judge to pre-

* Hon. Joe Billy McDade of the Central District of Illinois, sitting by designation.

side at trial. The Marion County prosecutor's office decided to proceed by indictment in Tyson's case. It submitted its request for the indictment to Judge Gifford's grand jury, and by doing so selected her to preside at trial.

This procedure (since abandoned, as we are about to see) was apparently limited to Marion County, but that is Indiana's most populous. We have not been told how long it had been in effect when Tyson's case arose, but apparently it was not a recent innovation or a secret one. Yet no other criminal defendant had ever thought to challenge its legality. The Indiana court of appeals, while rejecting Tyson's argument that the procedure had deprived him of his rights, criticized it as "totally inappropriate" because it made the criminal division of the Marion County superior court lack "the appearance of impartiality that is required to maintain the confidence of the public and the accused in the system." 619 N.E.2d at 300. The procedure was abandoned after this criticism, and the prosecutor no longer has any say in criminal trial assignments.

Although displeased with some of Judge Gifford's rulings at trial, Tyson does not claim that she was prejudiced against him, either because he was being tried for a sex crime or for any other reason. Even the dissenting judge in the Indiana court of appeals agreed that "Judge Gifford acted with complete and unswerving judicial integrity and impartiality." *Id.* at 301 n. 34. Nor does Tyson argue that the maintenance of a system of judicial selection deficient in "the appearance of impartiality" is a denial of due process. Such an argument is foreclosed in this circuit by *Del Vecchio v. Illinois Dept. of Corrections, supra,* 31 F.3d at 1370–79; see also *id.* at 1389–92 (concurring opinion); *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 826, 106 S.Ct. 1580, 1588, 89 L.Ed.2d 823 (1986); *United States v. Marion,* 404 U.S. 307, 325–26, 92 S.Ct. 455, 465–66, 30 L.Ed.2d 468 (1971). *Del Vecchio* is a recent capital case in which the issue was squarely presented, extensively discussed, and resolved against the defendant by the full court. Tyson's argument, rather, is that to allow the prosecutor to pick the judge so greatly stacks the deck against the defendant as to make the trial unfair—so unfair as to deny due process of law.

Trial judges have considerable discretionary power (we shall be considering an example from Tyson's trial in the next part of the opinion), and the exercise of discretion is shaped by a judge's values and intuitions, which in turn are shaped by the judge's background and experiences. Among a group of six American judges, even of the same court in the same county, there is likely to be considerable, and relevant, diversity in background and experience. Former prosecutors may have a different bent from former defense lawyers, former lawyers for tort plaintiffs a different bent from former lawyers for insurance companies. One must not exaggerate the impact of a judge's career and demographic characteristics on the judge's decisions. Most judges are conscious of the sources of unconscious bias and try with considerable success to overcome them. The presumption that judges are unbiased, *Del Vecchio v. Illinois Dept. of Corrections, supra,* 31 F.3d at 1372, is more than a pious hope. Yet if a litigant can choose which of six judges shall preside at the trial, that party may be able to obtain a subtle advantage over the other by selecting a judge more likely to resolve close questions in that party's favor, even if the trial is to be a jury trial so that the judge will not make the ultimate decision.

Is the advantage thus conferred so egregious as to deny due process of law? Even to reach that question we must decide whether Tyson is asking for a new rule of constitutional law, for if he is we cannot give it to him in a habeas corpus proceeding. *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). He says "no," that the rule he is contending for is as old as Montesquieu, who argued that liberty requires the separation of the judicial power from the executive and the legislative powers. Tyson claims that the only reason there are no cases condemning the practice of the prosecutor's picking the judge (he cites two cases, *State v. Simpson,* 551 So.2d 1303 (La.1989) (per curiam); *McDonald v. Gold-*

*stein,* 191 Misc. 863, 83 N.Y.S.2d 620, 626 (S.Ct.), aff'd, 273 A.D. 649, 79 N.Y.S.2d 690 (1948), but they are readily distinguishable from the present one) is that the practice is so patently unconstitutional that few jurisdictions have had the audacity to institute them.

We may assume for purposes of this decision that the absence of a precedent is not always fatal, though we can find no case that says so—though indeed the cases say that relief can be obtained in federal habeas corpus only on the basis of a ground *dictated* by precedent. *Teague v. Lane, supra,* 489 U.S. at 301, 109 S.Ct. at 1070; *Caspari v. Bohlen,* —— U.S. ——, ——, ——, 114 S.Ct. 948, 953, 955, 127 L.Ed.2d 236 (1994). A rule might be so unexceptionable that it had never been drawn into question in a reported case. But this is unlikely and in the present setting well-nigh inconceivable. If Tyson is right that allowing the Marion County prosecutor to pick the judge by picking the grand jury is so *obviously* unconstitutional as never to have *had* to be challenged to make its unconstitutionality clear, then why is it that, as we were assured by Tyson's able counsel at the oral argument, not a single one of the thousands of criminal defendants in Marion County who have been convicted after a trial by a judge chosen by the Marion County prosecutor's office has challenged the practice, except Tyson? No doubt most of these defendants were prosecuted by information rather than by indictment. But the Indiana court of appeals pointed out that the prosecutor could pick the trial judge there too, because of the system used for assigning judges to those cases. 619 N.E.2d at 300 n. 33. The answer may be that the constitutional infirmity in the practice, if there is such an infirmity, is subtle rather than obvious. But if it is subtle, habeas corpus is not the place to challenge it. Generalities about fair trials and evenhanded justice are not a substitute for specific holdings as a basis for a state prisoner's claiming in a federal habeas corpus proceeding that an *established* right of his was infringed. *Sawyer v. Smith,* 497 U.S. 227, 236, 110 S.Ct. 2822, 2828, 111 L.Ed.2d 193 (1990).

Tyson proposes as an *a fortiori* example of an unconstitutional practice a hypothetical system under which only the prosecution had a right of peremptory challenge of prospective jurors. Without meaning to express a view on the constitutionality of such a practice, we point out that it could be defended as appropriate to offset the great advantage enjoyed by the defendant in a criminal case by virtue of the prosecutor's having to prove guilt beyond a reasonable doubt. The system of criminal procedure, far from being balanced every step of the way, is an aggregate of imbalances. The peremptory challenge is a good example. Until the fourteenth century in England, *only* the prosecution could exercise peremptory challenges, and when the rule was changed, still the defendant had, in effect, fewer peremptory challenges than the prosecutor because the latter was allowed to challenge jurors for cause without actually showing cause. Jon M. Van Dyke, *Jury Selection Procedures: Our Uncertain Commitment to Representative Panels* 147–48 (1977). In America, not surprisingly, defendants were at first allowed more peremptory challenges than prosecutors, *United States v. Shackleford,* 59 U.S. (18 How.) 588, 15 L.Ed. 495 (1856); *Hayes v. Missouri,* 120 U.S. 68, 7 S.Ct. 350, 30 L.Ed. 578 (1887); Van Dyke, *supra,* at 147–50, but the tendency in modern American law has been toward equalization—in this respect. But with respect to the burden of proof of guilt, the system remains tilted toward the defense, while with respect to the impeachment of witnesses the system is tilted toward the prosecution, because the right to impeach with evidence of prior crimes is more valuable to the prosecutor than to the defense. Many criminal defendants have a criminal history and are afraid to testify lest the jury infer their guilt of the present crime from that history, even though the judge will instruct the jury to consider the history solely for its bearing on the credibility of their testimony.

With respect to investigation, too, the tilt is toward the prosecution—and a significant example is presented by this case. The grand jury was originally understood as a protection for people accused of crime, just like the petit jury. The modern reality is different. The grand jury is an investigative tool of the prosecutor, enabling him to obtain

the testimony of witnesses in secret and under oath, without the presence of lawyers to coach or shield them. Instances in which grand juries refuse to return indictments at the request of the prosecutor are almost as rare as hen's teeth. Any doubt on this score with respect to the criminal justice system of Indiana is dispelled by the fact that the choice whether to use a grand jury or skip it and file an information is the prosecutor's. Ind.Code §§ 35–34–1–1(a), (b).

How unfair, one might have expected Tyson to argue, that the prosecutor could decide whether to proceed by grand jury or by the filing of an information, but the defendant could not. It is as if, one might have thought, only the prosecutor were allowed to make peremptory challenges. That Tyson does not make the argument is a tacit recognition that the constitutionally required balance between prosecutor and defense is indeed a balance between the total advantages enjoyed by each side rather than an insistence on symmetry at every stage in the process.

We do not doubt that a shift at just one stage might so alter the total balance of advantages in favor of the prosecution as to deprive the defendant of the right to a fair trial. *Wardius v. Oregon*, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Allowing one side to choose the judge, albeit from a limited pool (judges of the criminal division of Marion County—not all residents of Marion County), might seem to illustrate a shift at one point in the process so momentous as to throw off the entire balance. The prosecutor's power to elect between indictment and information turns out to bear critically on this question. Once he decided to go the grand jury route, as he was entitled to do, he had no choice but to select the trial judge; for he had to designate the grand jury that he would ask to return an indictment, and that designation carried with it automatically the designation of the trial judge. The prosecutor could hardly have said to the judges of the criminal division, "I don't like your system of assignments, and I therefore ask you to assign a grand jury to this case by using a table of random numbers or some other aleatory device." Or, "Please don't assign the judge who presides over the grand jury to try the case; pick the trial judge at random." The prosecutor *himself*, however, could if he wanted pick the grand jury randomly—and for all we know, that is what he did. If so, there was a 16.67 percent chance of his getting Judge Gifford, which is not so low a probability as to prove that the prosecutor did *not* proceed randomly.

If the prosecutor did proceed randomly, the only serious objection to the challenged practice would be that it lacks the appearance of impartiality, and that is not enough to get Tyson a new trial. In passing, Tyson argues that the power of the prosecutor to pick or refuse to pick Judge Gifford to preside at future cases might cause her to rule in the prosecutor's favor in this case. But we do not understand how this system of rewards and punishments is supposed to work. Is the idea that if Judge Gifford rules in the prosecutor's favor, he will be sure to pick her whenever he has a sex-crime case? Is it plausible that she *wants* that? Or is the idea that he will reward her for ruling in his favor in Tyson's case by *not* steering future sex-crimes cases her way? Or that he will give her complex cases, or simple ones? High-profile cases, or low-profile ones? One could argue with equal force that federal district judges should not be permitted to try federal criminal cases, since the Department of Justice participates actively in recommending district judges for promotion to the court of appeals, thereby creating, on the logic of Tyson's argument, a fatal temptation for district judges to rule in favor of the prosecution. Such conjectures do not rebut the presumption of impartiality.

Tyson's lawyers made no effort to find out why the Marion County prosecutor's office selected Judge Gifford's grand jury and hence Judge Gifford. Had they done so and discovered that her grand jury was chosen because the prosecutors thought her most likely to rule in their favor at trial when discretionary rulings had to be made, then at least we would know that the challenged practice had worked to the prosecutor's favor in this case. It would not show that the

judge had been biased in favor of the prosecutor or prejudiced against Tyson; he disclaims making any charge of actual bias or prejudice. All it would show was that she had not been chosen randomly, and this would set the stage for a consideration of the constitutional issue that Tyson asks us to resolve. We cannot get to that stage, because we do not know whether Judge Gifford was chosen randomly, although that she was not is the premise on which Tyson seeks to distinguish *Del Vecchio* and to escape the gravitational pull of *Teague*. For all we know, the prosecutor chose Judge Gifford's grand jury (and hence Judge Gifford) because it had the shortest queue.

The practice of allowing the prosecutor to choose the grand jury and hence the trial judge is certainly unsightly, as the Indiana court of appeals opined; it does lack the appearance of impartiality; but that is all, so far as the record of this case discloses, and it is not enough—despite *Powers v. Ohio*, 499 U.S. 400, 411, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991), on which Tyson relies heavily. *Powers* holds that a defendant can complain about a prosecutor's racially motivated use of peremptory challenges even if the jurors whom the prosecutor used his challenges to strike would not have been favorable to the defendant. *Powers* is thus a kind of appearance-of-impropriety case. But race is special in the Supreme Court's thinking about criminal procedure. This is not an inference. It is what the Court has said. *United States v. Mechanik*, 475 U.S. 66, 70 and n. 1, 106 S.Ct. 938, 942 and n. 1, 89 L.Ed.2d 50 (1986); *Vasquez v. Hillery*, 474 U.S. 254, 263–64, 106 S.Ct. 617, 623–24, 88 L.Ed.2d 598 (1986). Here is an example: Challenges to the composition of the grand jury are usually moot if the defendant is convicted. The conviction proves that there was probable cause to try him, which means that a properly composed grand jury, had it been doing its job, would have indicted him. The irregularity is therefore harmless. *United States v. Mechanik, supra,* 475 U.S. at 70 n. 1, 106 S.Ct. at 942 n. 1 (1986); *United States v. Fountain,* 840 F.2d 509, 514–15 (7th Cir.1988). But there is an exception for challenges to racial discrimination in the composition of the grand jury. *Rose v. Mitchell,* 443 U.S. 545, 550–59, 99 S.Ct. 2993, 2997–3002, 61 L.Ed.2d 739 (1979); cf. *Allen v. Hardy,* 478 U.S. 255, 259, 106 S.Ct. 2878, 2880, 92 L.Ed.2d 199 (1986) (per curiam). To extend the principle of the race cases to complaints about practices that have nothing to do with race and do not obviously harm the defendant (for remember that *we do not know* whether the state selected Judge Gifford's grand jury because it wanted her to be the trial judge) is the kind of exploratory venture that *Teague* tells us not to embark on in a habeas corpus case.

■ There are, it is true, other types of constitutional error, unrelated to racial discrimination, that the Supreme Court has said cannot be overlooked on grounds of harmlessness. These include actual bias by the judge, and denial of assistance of counsel as distinct from denial of the right to effective assistance of counsel. *Sullivan v. Louisiana,* —— U.S. ——, ——, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). Such cases involve denial of the most fundamental constituents of due process—so fundamental that conviction in their absence is indecent even if the defendant is plainly guilty. "The Constitution requires (unless the defendant waives his rights) a certain modicum of adversary procedure even if the outcome is a foregone conclusion because the evidence of guilt is overwhelming." *Walberg v. Israel,* 766 F.2d 1071, 1074 (7th Cir.1985). The right to a judge who is free from the mere *appearance* of partiality is not part of due process at all, let alone a fundamental part.

■ The second, and the most difficult, issue raised by Tyson involves the exclusion of three defense witnesses. To explain it we must delve briefly into the facts. In July of 1991, both Tyson, the former world heavyweight boxing champion, and W——, an 18–year–old contender for the title of Miss Black America, were in Indianapolis for a festival known as "Black Expo." They met briefly at a rehearsal of the Miss Black America pageant, which was part of Black Expo—and at this point the opposing sides' versions of the facts begin to diverge. According to W——'s testimony, Tyson made no sexual advances to her during their initial encounter; nor did

they agree to a further meeting. Tyson testified that he told her right out that he wanted to have sexual intercourse with her ("I explained to her that I wanted to fuck her") and that her reply had been, "Sure. Just give me a call." He testified that he had told W___: "that's the way I am. I want what I want." He had testified to the opposite seduction strategy before the grand jury.

Several of the pageant contestants testified that after this initial encounter with Tyson, W___ speculated to them about the size of Tyson's penis, expressed the view that he lacked intelligence, commented about his wealth, noted that his ex-wife had gotten a lot of money out of him, and said that she could have him too. She denied making any of these statements.

At 1:30 a.m. the following morning, Tyson called W___ at her hotel from the phone in the limousine that he was renting. According to her testimony, which was corroborated by one of her hotel roommates and by the driver of the limousine, Tyson pleaded with her to join him for a tour of Indianapolis ("I just want to talk to you. Just come down and we'll go around Indianapolis"). At first she demurred, because she was already in bed, but eventually she consented. He said he was leaving early the next day and this would be their last time to talk. She got dressed and joined him in the limousine. He told the driver to stop at his hotel, because, according to W___, he wanted to get his bodyguard (or get something from the bodyguard—she wasn't sure which). Tyson testified that they were kissing in the limousine en route to the hotel. She denied this, adding in response to a question on direct examination that they had not been holding hands when they walked into the hotel.

They went upstairs to his suite. According to Tyson, they had intercourse there and she had been not only a willing, but an enthusiastic, participant, but had become annoyed afterward when he refused to escort her downstairs. According to W___, when they arrived at the suite she stayed in the parlor while Tyson went into the bedroom to make a phone call. After the call was over he invited her into the bedroom, saying, "I want to talk to you for a second." They

chatted innocuously for fifteen minutes. Then Tyson exclaimed, "You're turning me on." Startled, W___ asked to use the bathroom. When she emerged, Tyson was sitting on the bed, clad only in his underpants. She told Tyson, "It's time for me to leave." He grabbed her, forcibly removed her clothes, and raped her. She tried to fight him off, but it was like hitting a wall.

After it was over, she got dressed and left the hotel. According to the limousine driver, she "rush[ed] toward" the limousine and entered it "in a state of shock," "dazed," "disoriented," "frantic," muttering over and over: "I don't believe him. Who do he think he is? He's just a bad person." The driver drove her back to her hotel.

At 4 a.m., Tyson left his hotel for the airport. His bodyguard had made the flight arrangements at 2 a.m., which is to say right after the sexual encounter with W___. So hasty was the departure of Tyson's party that money and clothing were found in the rooms they had just vacated.

There is disagreement over what exactly W___ told her roommates when she returned from the encounter with Tyson. One of them testified that she said Tyson had tried to rape her. Several, however, testified (as did she) that she had told them Tyson *had* raped her. The next day she went to a hospital in Indianapolis for a vaginal examination. The examining physician testified that W___ had fresh vaginal abrasions that had taken a lot of force to inflict. Another physician testified that it was exceedingly unlikely that they could have been inflicted in the course of consensual sex unless the woman had vaginal dryness or some related gynecological condition, which W___ did not. The defendant's expert witness testified that even in the absence of such a condition, consensual sex might generate sufficient friction to cause the abrasions that W___ had experienced. W___ was not otherwise injured, and continued participating in the Miss Black America pageant. The theory of the defense was that W___ had fabricated a charge of rape because her father had threatened to kill her if she had sex and she was afraid that he would hear rumors that she had had sex with Tyson.

All this is by way of background to the issue of the excluded witnesses. Shortly before the trial began, Judge Gifford had ordered the defense to disclose to the prosecution the names, addresses, and phone numbers of all witnesses whose testimony would relate to the issue of consent. The propriety of the order is not questioned. A later order, also unquestioned, made the previous order a continuing one, so that any time the defense discovered additional witnesses whose evidence would bear on consent it was required to disclose their names, etc., to the prosecutor.

The trial began on a Monday, and the prosecution began presenting its case on Thursday. That night, a lawyer working for Tyson's local counsel learned that three women claimed to have information relevant to the case. By Friday evening a member of the defense team had spoken with them. These women claimed to have seen Tyson and W____ necking in the back of the limousine when it arrived at Tyson's hotel and entering the hotel hand in hand. Skeptical that anyone could see into the limousine through its tinted windows, especially at night, the lawyers decided to inspect the limousine. They got a court order (the limousine was back in the possession of the livery service that owned it) on Saturday morning and inspected the limousine that evening and concluded that one could see into the back seat of the limousine easily enough. The next day, after further interviews with the three potential witnesses, they called the prosecutor and gave him the names, addresses, and telephone numbers of the three together with a summary of their expected testimony.

Trial resumed on Monday and the defense immediately moved to be allowed to call the three as additional witnesses, accompanying the motion with an offer of proof. The state objected. It had nearly completed its case in chief and it feared the impact of these surprise witnesses on the jury. Judge Gifford, while not believing that the defense had *deliberately* violated the order (a continuing order, remember) to turn over the information about the new witnesses, appears to have believed that they had violated it, even

if innocently, by not turning over the information at the earliest possible moment (which would have been sometime Friday), or at least by waiting until Sunday. After weighing the pros and cons of allowing the witnesses to testify anyway, she refused to let the defense call any of the new witnesses.

■ The Sixth Amendment entitles a criminal defendant "to have compulsory process for obtaining witnesses in his favor." *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), held that this provision is applicable to state criminal defendants via the Fourteenth Amendment and entitles them to call witnesses on their behalf. In reference to this holding, the Court later said: "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). Judge Gifford's ruling excluded witnesses that Tyson wanted to call to bolster his defense of consent. We use the term "defense" here loosely. Lack of consent is part of the definition of rape and must therefore be proved by the state beyond a reasonable doubt. Ind.Code § 35–42–4–1(a); *Warren v. State*, 470 N.E.2d 342, 344 (Ind.1984). That of course does not affect the principle to which Tyson appeals.

■ A court does not violate the Constitution every time it sustains an objection to the testimony of one of the defense witnesses, or for that matter every time it excludes one of those witnesses altogether (for example as a remedy for violating a rule, such as Fed.R.Crim.P. 12.1(d), requiring advance notice of all alibi witnesses). The Supreme Court established the latter point, with specific reference to the exclusion of eyewitnesses on the basis of the violation of a discovery order requiring that their names be furnished to the prosecutor in advance, in *Taylor v. Illinois*, 484 U.S. 400, 410–16, 108 S.Ct. 646, 653–57, 98 L.Ed.2d 798 (1988). But the Court made equally clear in that case that the state cannot, in the name of policing the discovery process, arbitrarily stifle a defendant's efforts to offer vital evidence. *Id.* at 409, 108 S.Ct. at 653; see also *Lange v. Young*, 869 F.2d 1008, 1011 (7th Cir.1989). No hard and fast rule has been devised to

strike the balance between the competing interests. No one doubts that criminal defendants like other parties to litigation can be subjected to reasonable rules regulating discovery. The central aim of such rules is to minimize surprise at trial by requiring disclosure of witnesses in advance of trial. The rules are empty if they cannot be enforced, and weak if they can be enforced only against willful violators. Although some courts believe nevertheless that the exclusion of a witness or witnesses who would be helpful to the defendant is permissible only if the violation of the discovery order was deliberate, see *Bowling v. Vose,* 3 F.3d 559 (1st Cir.1993); *United States v. Peters,* 937 F.2d 1422, 1426 (9th Cir.1991); *Escalera v. Coombe,* 852 F.2d 45, 48 (2d Cir.1988) (per curiam), as it was in *Taylor* itself, other courts disagree. *United States v. Johnson,* 970 F.2d 907, 911 (D.C.Cir.1992); *United States v. Cervone,* 907 F.2d 332, 346 (2d Cir.1990). Our court has yet to take a position on the question, and *Taylor* itself appears to leave the question open. Apart from any question of willfulness, the right of the trial judge to exclude witnesses sought to be called in violation of a discovery order, if their testimony would be of slight probative value, cannot be doubted. *People of Territory of Guam v. Palomo,* 35 F.3d 368, 374–75 (9th Cir.1994); *United States v. Duggan,* 743 F.2d 59, 82 (2d Cir.1984); cf. *United States v. Tanner,* 941 F.2d 574, 585–86 (7th Cir.1991); *United States v. Wallace,* 32 F.3d 921, 929 (5th Cir.1994). The area of uncertainty concerns the case in which the excluded witnesses would undoubtedly have been at least somewhat helpful to the defense and the violation of the discovery order was not willful.

■ We do not think that a hard and fast rule to govern that case is feasible or desirable. Given the competing considerations identified above, the highly situation-specific character of the judgment that the trial judge is called upon to make in the hurly-burly of trial, the limited scope of federal habeas corpus, and (a closely related point) the desirability of avoiding continuous and heavy-handed federal judicial intervention in the conduct of state criminal trials, we do not consider it a proper office of a federal court in a habeas corpus proceeding to second-guess a discovery ruling unless we are convinced that it is, in the circumstances, unreasonable. We must examine Judge Gifford's ruling for conformity with the standard of reasonableness.

■ The discovery order that she had issued in advance of the trial was vague, but she did not abuse her discretion by interpreting it to require the disclosure of newly discovered consent witnesses as soon as possible, which the Indiana court of appeals not unreasonably interpreted to mean by Friday evening. *Tyson v. State, supra,* 619 N.E.2d at 283. Hence the order was violated. It was not a technical or immaterial violation, although it was not willful. Given that the trial had begun, and that the prosecution's case was moving rapidly to a close, the defense can certainly be criticized for having waited until Sunday to notify the prosecutors of the new witnesses. By sometime on Friday the defense team had their names and a rough idea of their testimony, and it should have notified the prosecution immediately, especially since Saturday was a trial day. Tyson's argument that it would have been irresponsible to notify the prosecution before talking to each of the three potential witnesses in person and inspecting the limousine, and even disloyal to Tyson to disclose their identity to the prosecution before making sure that their evidence would not be more helpful to the prosecution than to the defense, is not compelling. If the witnesses proved worthless to Tyson, there would be no harm done to the defense unless it turned out that they could give testimony helpful to the prosecution, but that is always a risk in identifying potential witnesses to one's adversary. *Williams v. Florida,* 399 U.S. 78, 83–84, 90 S.Ct. 1893, 1896–97, 26 L.Ed.2d 446 (1970). The defense could on Friday have sought a modification of the discovery order, but did not do so.

Since, however, the violation of the order was not willful (at least so far as appears), six years in prison for the client would undoubtedly be an excessive sanction for the violation; but we cannot stop there. We must distinguish between sanctions as punishment designed to prevent future violations of simi-

lar orders, and sanctions as means of achieving the specific objective of the specific order. Allowing the surprise witnesses to testify would have delayed the trial, and worse. As Tyson concedes, the prosecution would have been entitled to call additional rebuttal witnesses in an effort to offset the impact on the jury of the three new witnesses; or to be granted a continuance to conduct an additional investigation, for example to determine whether it was possible to see into the limousine's interior at night. Delay in a jury trial is a serious matter, especially when, as in this case, the jury is sequestered. The prosecution's ability to rebut the surprise witnesses effectively would, moreover, have been less than its ability to have pulled their fangs by adroit questioning of W___ and other prosecution witnesses during the case in chief. W___ could have been asked how dark it was and whether there were people standing on the sidewalk when she and Tyson walked into the hotel together and how close their hands were—might an onlooker have *thought* they were holding hands? She could have testified to this on rebuttal, too, had the witnesses been allowed into the case. But to have recalled her to the stand on rebuttal for the express purpose of replying to the surprise witnesses would have magnified the impact of their testimony; would have made it seem that the prosecution had been—surprised. Which it would have been. The purpose of the discovery order was to prevent surprise; and the purpose of excluding evidence whose introduction would have violated the order was not merely to punish violators but also to achieve the objective of the order by keeping surprise out of the case.

We must not exaggerate. The witnesses would, after all, have been testifying to what Tyson had already testified to, and the prosecutor had had ample opportunity not only to cross-examine him but to produce evidence (for example through examination of W___) to contradict him. And if the prosecutor had received timely notice of the witnesses on Friday, it still would have been thrown off its guard to some extent; yet there would have been no violation of the discovery order.

If the test for whether enforcing a discovery order by excluding a witness is, as we think it must be, reasonableness in the circumstances, one highly relevant circumstance is the importance of the excluded witness to the defense. Yet even if in a particular case—and we need not decide whether this is one—the exclusion of a witness were deemed to violate the Sixth Amendment irrespective of the witness's importance to the defense, this would not necessarily carry the day for Tyson; rather, it would shift our consideration to a different stage, that of harmless error. With certain immaterial exceptions (some of which we mentioned in discussing Tyson's first challenge to his conviction), a constitutional error is grounds for relief in a federal habeas corpus proceeding only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, — U.S. —, —, 113 S.Ct. 1710, 1721, 123 L.Ed.2d 353 (1993). This is the standard formula, as the Court explained, for harmless error, but Tyson argues that it is applicable to constitutional claims made in federal habeas corpus proceedings only if the state appellate court, in reviewing the same claim of constitutional error, applied the more stringent standard (harmless error beyond a reasonable doubt) of *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). We think this is wrong. The reasons the Court gave in *Brecht* for adopting a less stringent rule are independent of the rule applied in the state appellate process. See — U.S. at —, —, 113 S.Ct. at 1720–21. It has to be wrong, since ordinarily and here the state court will not have found any error and therefore will have had no occasion to apply any standard of harmless error. *Brecht* itself was a fluke in this regard; the state courts had considered the issue of harmless error and applied the *Chapman* standard. Nothing in the Court's statement of its holding suggests a limitation to those peculiar circumstances, see *id.* at —, 113 S.Ct. at 1721—a limitation that would rob the decision of any general significance. And we suggested no such limitation when we interpreted *Brecht* in *Tague v. Richards*, 3 F.3d 1133, 1140 (7th Cir.1993). The Fourth Circuit, in *Smith v. Dixon*, 14 F.3d 956, 975–80 (4th Cir.1994) (en banc), has expressly rejected the proposition that the *Brecht* standard

is inapplicable unless the state courts have conducted an analysis of harmless error, and we are not persuaded by the contrary view taken by the Eighth Circuit (without mention of *Smith* ) in *Starr v. Lockhart,* 23 F.3d 1280, 1292 (8th Cir.1994).

So the standard of *Brecht* applies. Tyson flunks it. The surprise witnesses were not witnesses to the alleged crime. For a woman to kiss (or allow herself to be kissed by) a man in a limousine, and to hold hands with him while walking into a hotel, may be imprudent, depending on the man, but they are not—not in our society, not today at any rate—tokens of consent to sexual intercourse whether in the man's hotel room or anywhere else. They may make his testimony that she consented slightly—very slightly—more plausible, and to that extent be relevant; but they have real significance only if they are denied. The significance of the testimony of the three surprise witnesses would have been as impeachment. Their testimony, if believed, would have suggested that W__ had been lying when she denied having necked with Tyson in the car or held hands with him walking into the hotel; and if she had lied about these things, maybe she had lied about other things—about being raped, for example. Tyson says the witnesses' testimony would have corroborated his testimony; yes, by impeaching a witness who had contradicted his testimony.

We do not suggest that the exclusion of impeaching evidence can never be harmful error. In *Sandoval v. Acevedo,* 996 F.2d 145, 149 (7th Cir.1993), we said it could be. Cf. *United States v. Bagley,* 473 U.S. 667, 676–77, 105 S.Ct. 3375, 3380–81, 87 L.Ed.2d 481 (1985). It depends on the circumstances. Here there was plenty of impeaching evidence available to and used by Tyson. A number of witnesses as disinterested as the three surprise witnesses would have been had testified that W__ had told them things inconsistent with her testimony—and inconsistent on more vital points than necking and holding hands. The additional witnesses would have helped, maybe a lot (the state certainly took that position in opposing their admission)—but maybe a lot primarily because they would have been surprise witnesses, and that is a form of help to which the defense was not entitled. And maybe the prosecution could have impeached *them,* by asking them why they had waited till the middle of the trial to come forward with their evidence. Tyson is a celebrity, the trial was heavily publicized, and the defense itself defends its delay in disclosing the identity of the witnesses to the prosecution by pointing out that it had been flooded with crank calls and needed to make sure these three callers were not cranks.

It is not as if this were a case where the only evidence of rape is the witness's testimony. There was, as we noted, physical evidence of rape. There was the testimony of the limousine driver about W__'s manner when she reentered the limousine. There was also evidence that her clothing had been torn, and a piece left in Tyson's hotel room. There was the precipitous flight from the hotel by Tyson and his party. Given all the evidence and all the opportunities afforded and taken for impeaching W__'s testimony, we cannot believe that the exclusion of the surprise witnesses had a substantial and injurious effect on the jury's deliberations. Cf. *United States v. Martinez,* 988 F.2d 685, 701–02 (7th Cir.1993); *United States v. Petitjean,* 883 F.2d 1341, 1348 (7th Cir.1989); *Lange v. Young, supra,* 869 F.2d at 1012. We do not have even a "grave doubt" on this score. *O'Neal v. McAninch,* —— U.S. ——, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

█ The last issue is whether the judge denied Tyson due process of law by refusing to instruct the jury on the defense of reasonable mistake about the existence of consent. In a situation of alleged "date rape," the alleged rapist may have thought the woman was consenting to have sex with him, though she was not. And if his mistake was reasonable, that is a defense under Indiana law, just as in the parallel case of self-defense in a prosecution for murder (and it is a true defense, unlike the "defense" of actual consent to intercourse). Ind.Code § 35–41–3–7; *Boyd v. State,* 564 N.E.2d 519 (Ind.1991); *Woods v. State,* 587 N.E.2d 718, 723 (Ind.App.1992). We have already seen that a criminal defendant has a constitutional right to present witnesses in support of

whatever defenses to the offense with which he is charged state law creates. The right would be empty if it did not entail the further right to an instruction that allowed the jury to consider the defense. *Everette v. Roth,* 37 F.3d 257, 261 (7th Cir.1994). But that further right comes into play only when there is some evidence. Suppose marriage were still a defense to rape in Indiana. Tyson could not have requested a jury instruction on that defense, because there is no evidence that he and W___ were married.

How much evidence must there be to entitle a defendant to an instruction? Enough to create a reasonable doubt of guilt in the mind of a reasonable juror. *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988); *Everette v. Roth, supra,* 37 F.3d at 261. There was not enough here. If Tyson was believed, there was actual consent. If W___ was believed, there had been no manifestation of consent. Of course the jury might have believed neither completely, and the question is then whether, had they believed W___ to the extent of agreeing that she had not in fact consented to have sex with Tyson, they might nevertheless have found that Tyson could reasonably have misunderstood her words or behavior as expressing consent. Given the case as it was presented to the jury, such a finding would have been so speculative as to be unreasonable. Nothing in Tyson's testimony gave a hint of possible misunderstanding. According to him, W___ had been not merely a willing but an enthusiastic participant. Obviously the jury disbelieved this. Nothing in W___'s testimony gave a hint of possible misunderstanding either. She did testify that she said "Yeah" when he asked whether she would like to be on top—she testified that she said this in the hope that if she were on top rather than below him this would facilitate her escape—but at this point the crime of rape was complete, because penetration had occurred. The testimony was thus irrelevant to the issue of reasonable mistake about consent. *State v. Williams,* 696 S.W.2d 809, 812–13 (Mo.App.1985).

Of course the jury might have disbelieved some, even much, of W___'s testimony—might have thought she acted imprudently, might have thought that she knew she was playing with fire, even that she "led him on"—without believing that she consented to have intercourse with Tyson. But to take the next step, and believe that she manifested consent to him, would require some testimony concerning events in the suite, testimony on which the jury might have hung its judgmental cap; and that is missing. Neither Tyson nor W___ testified to ambiguous words or conduct from which consent might reasonably though erroneously have been inferred. No other witness, either, furnished such evidence. In its absence there was no basis for the requested instruction. *Id.* at 812–13; *State v. McPherson,* 882 S.W.2d 365, 374 (Tenn.Crim.App.1994); *Boyd v. State, supra,* 564 N.E.2d at 523; cf. *United States v. Starnes,* 14 F.3d 1207, 1211 (7th Cir.1994); *United States v. Searing,* 984 F.2d 960, 966–67 (8th Cir.1993).

Though it should be obvious, we add that possible manifestations of consent *before* W___ entered the bedroom would not be enough evidence to require that an instruction on reasonable mistake be given. Cf. *Boyd v. State, supra,* 564 N.E.2d at 523. The law of rape is not a part of the law of contracts. If on Friday you manifest consent to have sex on Saturday, and on Saturday you change your mind but the man forces you to have sex with him anyway, he cannot use your Friday expression to interpose, to a charge of rape, a defense of consent or of reasonable mistake as to consent. You are privileged to change your mind at the last moment.

Suppose the jury had believed Tyson's version of his first conversation with W___ (when, according to that version, she had explicitly consented to have sex with him when he called), but also believed that she had changed her mind sometime between then and the beginning of intercourse and had made her change of mind clear to Tyson. It would still have been too large a step for the jury to take to infer that Tyson could reasonably have assumed consent at that moment. In light of the uncompromising character of Tyson's testimony, the lack of any hint in W___'s testimony of words or acts by

which she might have manifested consent after her entry into the bedroom but before the rape, and the absence of any other witness, the jury would have been engaging in sheer speculation had they attempted a reconstruction of the preliminaries to the rape that would have established the defense of reasonable mistake. We therefore do not think that it was an error, at least an error of constitutional magnitude, to refuse the instruction.

AFFIRMED.

FLAUM, Circuit Judge, concurring.

I agree with the majority's view that Marion County's now-extinct system for assigning trial judges did not violate Tyson's right to a fair trial and that the trial court did not err in refusing Tyson's proffered jury instructions. I write separately because I believe the trial court's exclusion of witnesses as a sanction for Tyson's breach of the court's discovery order violated his Sixth Amendment rights; an error, however, that in the habeas corpus context of this case must be deemed harmless.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor." U.S. CONST. amend. VI. "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). This right is not absolute, however, and must yield to the "enforcement of firm, though not always inflexible rules relating to the identification and presentation of evidence." *Taylor v. Illinois,* 484 U.S. 400, 411, 108 S.Ct. 646, 654, 98 L.Ed.2d 798 (1988). In *Taylor,* the Supreme Court held that a trial court can in certain circumstances exclude witnesses as a sanction for a discovery breach without violating the constitution. *Taylor* mandates that in determining whether to decree such a sanction, a court must exercise its discretion by balancing a defendant's "fundamental right" against "countervailing public interests," including:

the integrity of the adversary process, which depends both on the presentation of

reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process....

*Id.* at 414–15, 108 S.Ct. at 656. The Court stated that it was neither "necessary nor appropriate to draft a comprehensive set of standards to guide the exercise of discretion in every possible case." *Id.* at 414, 108 S.Ct. at 656.

The *Taylor* Court upheld the exclusion of an alibi witness of whom the defense had known but had failed to disclose in response to the prosecution's pre-trial discovery request. The Court noted that the defense had acted willfully and in bad faith in not disclosing the witness until after the prosecution's two primary witnesses had testified. In addition, the Court identified a "sufficiently strong inference that 'witnesses are being found that weren't really there,' to justify the sanction of preclusion." *Id.* at 417, 108 S.Ct. at 657. "Regardless of whether prejudice to the prosecution could have been avoided [by a less severe sanction], it [was] plain that the case fit[ ] into the category of willful misconduct in which the severest sanction [was] appropriate." *Id; see also Eckert v. Tansy,* 936 F.2d 444 (9th Cir.1991); *Chappee v. Vose,* 843 F.2d 25 (1st Cir.1988).

The First Circuit has subsequently found constitutional error in a trial court's exclusion of an alibi witness as a sanction for a discovery violation. *Bowling v. Vose,* 3 F.3d 559 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1236, 127 L.Ed.2d 580 (1994). In *Bowling,* the defense divulged the name of an alibi witness after the close of the prosecution's case and five days after a prosecution witness testified on cross-examination to an earlier starting time than the prosecution had originally estimated for the arson fire. In applying *Taylor,* the court first noted that the defense had not acted in bad faith because even though it had previously known about the witness, it could not have known of her importance until after it had cross-examined the prosecution's witness. The court thus viewed defense counsel's conduct as "negligence at worst." The court concluded that the exclusion of exculpatory evidence

would distort, rather than further, the truth-seeking function of the trial, and held that the non-willful nature of the violation allayed fears that the testimony had been fabricated. Finally, the court stated that because the evidence consisted of only one witness, whose testimony was not of a technical nature, a continuance could have sufficed, even though the prosecution would have been prejudiced by the introduction of a new defense theory. *Id.* at 562.

*Taylor* indicates that willful misconduct and clearly unreliable testimony constitutionally support the dramatic sanction of witness exclusion. *Bowling,* on the other hand, teaches that a trial court cannot exclude reliable testimony as a sanction for negligent conduct that would pose minimal prejudice to the prosecution. Turning to the instant case, it is necessary to determine whether the trial court abused its discretion by ordering witness exclusion as a sanction for defense counsel's discovery violation.

As an initial matter, I agree with the majority that the trial court did not abuse its discretion in holding that its discovery order required disclosure as soon as possible. The Indiana Court of Appeals interpreted this to mean Friday evening after an attorney from defense counsel's office had interviewed the women and discussed their information with the trial team. *Tyson v. Indiana,* 619 N.E.2d 276, 283 (Ind.App.1993) ("The trial court reasonably concluded that, at that time, the State should have been notified of the existence of the women and their potential testimony."), *cert. denied,* ―― U.S. ――, 114 S.Ct. 1216, 127 L.Ed.2d 562 (1994). Therefore, the defense violated the discovery order by failing to apprise the prosecution and court of the new witnesses until Sunday and Monday respectively. The trial court did not find either that the defense had acted willfully or in bad faith or that it should have discovered these witnesses at an earlier date.

A primary ground given by the trial court for excluding the witnesses was their potentially prejudicial effect on the government's case. It has never been held that the defense violated the order for the purpose of achieving a tactical advantage. *See Taylor,* 484 U.S. at 417, 108 S.Ct. at 657. The de-

fense's violation may still have given Tyson such an advantage because the defense alone knew of the potential testimony of these witnesses and perhaps used that information in cross-examining several of the prosecution's witnesses. Yet my review of the trial record indicates that the state courts may have overestimated the advantage gained by the defense. The state courts appeared to accept that the defense knew about the testimony when it cross-examined the victim, the hotel personnel, and the limousine driver. The defense actually cross-examined most of these witnesses, including the victim and hotel personnel, before the investigating attorney had interviewed the newly discovered witnesses. Whether the investigator could or should have interviewed these witnesses earlier is not at issue here. Therefore, the defense could only have cross-examined witnesses on Saturday, including the limousine driver, with any unfair knowledge. Moreover, even if the discovery of the witnesses was a surprise, the basis of their testimony was not. Tyson had already testified before the grand jury that he and the victim had kissed in the limousine. *Cf. Chappee,* 843 F.2d at 31 ("Once the Commonwealth had been cradle-slung into a false sense of security, and [their witness] subjected to cross without *fair warning of the nature of the defense,* [the defendant's] chances of success ... were (unfairly) maximized.") (emphasis added). All of this appears to suggest that the prejudice to be suffered by the prosecution and the advantage to be gained by the defense had the witnesses testified may not have been as extensive as the state courts believed.

The prosecution also argued that the defense's discovery breach had prejudiced it in three other ways. First, the State asserted that the introduction of these witnesses would disturb the rhythm of its case by requiring a continuance of several days, if not a week, while it prepared to examine them and reevaluated its case-in-chief. Second, it contended that this delay would have adversely affected the sequestered jury. Third, the prosecution maintained that the use of these witnesses would have required it to recall certain witnesses on rebuttal, a po-

tentially less effective method of examination. The trial court seemed to accept some or all of these arguments, stating that "the State has, in fact, been prejudiced in this matter ... [and the prejudice] cannot be cured by a recess or a continuance because of the fact that we are in the middle and almost completed with the State's presentation of the evidence based on what they thought the evidence was to show." *Cf. United States v. Johnson,* 970 F.2d 907, 912 (D.C.Cir.1992) (noting that the alternative sanction of a continuance would clearly have "disrupted the trial schedule and harmed the government, which had brought in witnesses from all over the country," and a second alternative of a delay after the prosecution had rested would also have been "burdensome as it would have required holding a jury over during the delay").

This conclusion of prejudice overlooks that the prosecution would have faced most of the delay and disruption even without the defense's discovery violation because it, like the defense, would still have been caught off guard by the arrival of these witnesses. Even if the defense had apprised the prosecution and the court of the existence of these witnesses on Friday evening, the prosecution would have had to attempt to find witnesses to impeach them and would have had to prepare its case accordingly. In determining whether the trial court abused its discretion in holding that the defense's conduct, and the effects of its actions warranted the sanction of exclusion, the defense should not be held totally accountable for such unavoidable consequences.

The late arrival of these witnesses in this well-publicized case could also lead to doubt about the reliability of their testimony. The Supreme Court has said that it is reasonable "to presume that there is something suspect about a defense witness who is not identified until after the 11th hour has passed." *Taylor,* 484 U.S. at 414, 108 S.Ct. at 655. Such a presumption is not appropriate here. These witnesses surprised the defense with their initial contact. Indeed, an attorney not associated with either party in the case but a relative of one of the proposed witnesses twice advised these women not to come for-

ward with their information and to avoid becoming involved in the case. In these circumstances, one cannot easily presume that the testimony was fabricated. The prosecution's contentions that the women may have seen Tyson with his girlfriend on a different night, or that they could not really have seen what they said they did, were more properly matters for the State's cross-examination and a jury determination. Because these witnesses were apparently relevant and not clearly unreliable, their exclusion potentially hindered, rather than furthered, the truth-seeking purpose of the trial.

In light of the discussion above, did the facts of this case warrant the sanction of witness exclusion? The Supreme Court did not hold in *Taylor* that a court could order witness preclusion as a sanction for every discovery violation. *Michigan v. Lucas,* 500 U.S. 145, 152, 111 S.Ct. 1743, 1748, 114 L.Ed.2d 205 (1991). Instead, the exclusion sanction should be limited to the "most extreme situations," *Taylor,* 484 U.S. at 417 n. 23, 108 S.Ct. at 657 n. 23 where the defense's conduct and the detrimental effects of that conduct outweigh the defendant's constitutional rights. In my judgment, this case did not present such circumstances. The defense, in violating the discovery order, acted neither willfully nor in bad faith and cannot be said to have seriously endangered the integrity of the judicial system. The testimony was not clearly unreliable and did not present a new defense theory. It is true that the use of these witnesses might have required a continuance in a trial with a sequestered jury and might have required the prosecution to bring back certain of its witnesses on rebuttal. However, the prejudice and delay the State would have suffered in these circumstances cannot be completely attributed to the defense. Balancing these factors, I would hold that Tyson's constitutional rights outweighed the seriousness and effects the defense's discovery violation. Where, as here, there is no willful misconduct by the defense, limited prejudice to the State, and potentially material testimony, witnesses should not be excluded as a sanction for a

discovery violation consistent with the Sixth Amendment.[1]

A finding of constitutional error does not end the inquiry, however, for *habeas* relief is not granted unless the error had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1721, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *see also O'Neal v. McAninch,* —— U.S. ——, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) ("When a federal judge in a *habeas* proceeding is in grave doubt about whether a trial error of federal law had a substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless.") (internal quotations omitted). As the majority indicates, *Brecht* is applied even if the state courts failed to employ the more stringent "harmless beyond a reasonable doubt" standard of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

The erroneous exclusion of cumulative or impeaching evidence usually constitutes harmless error. *See, e.g., United States v. Martinez,* 988 F.2d 685, 701–02 (7th Cir.) (exclusion of victim's racist and violent nature, offered as support for defendant's defense of provocation, if error, was harmless where other evidence of victim's violence was already before the jury), *cert. denied,* —— U.S. ——, 114 S.Ct. 125, 126 L.Ed.2d 89 (1993); *United States v. Petitjean,* 883 F.2d 1341, 1348 (7th Cir.1989) (in extortion trial, any error in limiting cross-examination of victim as to amounts he owed defendant to show victim's lack of credibility was harmless where five other witnesses testified to the victim's poor reputation for truthfulness); *Lange v. Young,* 869 F.2d 1008, 1012 (7th Cir.) (any error in excluding physician's testimony that defendant had previously been diagnosed as paranoid-schizophrenic was

harmless where defendant's medical records were admitted and three other doctors testified as to his present schizo-type personality disorder), *cert. denied,* 490 U.S. 1094, 109 S.Ct. 2440, 104 L.Ed.2d 996 (1989). *But see Sandoval v. Acevedo,* 996 F.2d 145, 149 (7th Cir.1993) ("[I]mpeachment evidence can be vital."). In the present case, all of the prior courts, as well as the majority here, have concluded that these witnesses would have presented cumulative impeachment evidence, and I concur. Clearly, this victim was otherwise impeached during the trial. Some witnesses testified that the victim made certain comments about the defendant during the day before the rape, which statements she denied making. Other witnesses testified that the victim told them certain versions of rape, most of them dissimilar from each other and from the account she presented. Even with all of this impeachment of the victim the jury chose to believe her version of the critical events in the hotel room. It is true that the excluded testimony would not have been cumulative in the sense of repeating what other witnesses had previously said or would say. However, these witnesses would have only given additional evidence contradicting the victim, in this case about a matter ultimately distinct from the issue of consent.

Moreover, the jury's verdict was supported by other evidence. In addition to the jury's assessment of Tyson's testimony, the prosecution presented physical evidence of the victim's vaginal abrasions consistent with sexual assault. *See ante* at 443. The State introduced evidence that the victim's clothing was torn the critical evening and that the police found a sequin from that outfit in Tyson's hotel room. Furthermore, the limousine driver testified to the victim's agitated state after leaving Tyson's hotel and the prosecution tendered evidence of Tyson's hurried

---

**1.** A trial court, of course, has the power to exclude evidence for reasons other than a violation of a discovery order, such as where newly discovered evidence is immaterial and its introduction would cause a serious disruption of the trial, the witness is deemed incompetent to testify, the evidence is hearsay, or there have been other infractions of the rules of evidence. *See People v. Palomo,* 35 F.3d 368, 374 (9th Cir.1994), *cert.*

*denied,* —— U.S. ——, 115 S.Ct. 750, 130 L.Ed.2d 650 (1995). I cannot determine what the court would have done absent this specific discovery violation, and how I might view that decision, because here the court relied on the fact that this was a "substantial discovery violation," and excluded the witnesses as a sanction for that breach.

departure from Indianapolis shortly after the critical events. All of this serves to buttress the argument that the error in this case was harmless.

In *O'Neal v. McAninch*, the Supreme Court's most recent pronouncement on *habeas* harmless error review, the Court stated that when a judge has grave doubts as to whether an error substantially affected the jury's verdict, he must find that it was not harmless. — U.S. ——, 115 S.Ct. 992. In other words, when "the matter is so evenly balanced that he feels himself in virtual equipoise," *id.*, the judge must find in the defendant's favor. Against the backdrop of this case, and recognizing the constraints imposed by *habeas* review, I do not possess "grave doubt" about the effect of this error. Although the excluded impeachment evidence was apparently relevant and arguably would have further addressed the victim's credibility, strong impeachment along with significant other evidence corroborating the victim's allegations had already been admitted. In light of this record, I cannot conclude that the excluded testimony would have had a substantial effect on the verdict.[2]

For the foregoing reasons, I concur.

---

**2.** "Insofar as possible the habeas or appellate court shuns resolving credibility and weighing the evidence. Nevertheless, the *Brecht–Kotteakos* test for harmless error requires the habeas court to evaluate to some extent the probability of the outcome if the case were tried [with the excluded evidence]." *Everette v. Roth*, 37 F.3d 257, 262 (7th Cir.1994); *Carter v. DeTella*, 36 F.3d 1385, 1392 (7th Cir.1994); *Cuevas v. Washington*, 36 F.3d 612, 621 (7th Cir.1994).